**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

Patrick LaCross, *et al.*,

             Plaintiffs,

v.

Knight Transportation Incorporated, *et al.*,

             Defendants.

No. CV-15-00990-PHX-JJT

**ORDER**

At issue are two Motions: 1) Blackstone Law's Motion and Application for an Order Substituting Blackstone Law as Counsel of Record for Representative Plaintiffs Robert Lira and Matthew Lofton, Appointing Blackstone Law as Class Counsel, Compelling Marlin & Saltzman to Transmit a Copy of its Entire Case File to Blackstone Law, and Granting a Continuance of all Deadlines (Doc. 291), to which Plaintiff Patrick LaCross (Doc. 306) and Defendant Knight Transportation Inc. (Doc. 299) filed Responses, and Blackstone Law filed a Reply (Doc. 310); and 2) Plaintiff Patrick LaCross's *Ex Parte* Motion for Issuance of a Temporary Restraining Order and Setting an Order to Show Cause Why Respondents Should not be Constrained from Interfering with the Prosecution of this Matter (Doc. 293), to which Blackstone Law filed a Response (Doc. 301) and Patrick LaCross filed a Reply (Doc. 315).

The Court held an evidentiary hearing and oral argument on the Motions on October 17 and 19, 2023. (Docs. 321, 330; Doc. 341, 10/17/23 Hr'g Tr.; Doc. 342, 10/19/23 Hr'g Tr.)

## I.    BACKGROUND

1
2          This lawsuit began almost ten years ago, on March 3, 2014, when Plaintiffs Patrick
3    LaCross, Robert Lira, and Matthew Lofton—all represented by James Trush of the Trush
4    Law Office, APC and Brennan Kahn and Todd Harrison of the law firm of Perona, Langer,
5    Beck, Serbin, Mendoza & Harrison, APC ("Perona Firm")—filed a Class Action
6    Complaint in the Superior Court of California. (Doc. 1-3 at 5–39, Compl.) Plaintiffs seek
7    damages against the companies for which they operated trucks, Knight Transportation, Inc.
8    and Knight Truck and Trailer Sales, LLC (collectively, "Knight"), for what they claim are
9    multiple wage and hour violations.

10         On April 18, 2014, Knight removed this action to the United States District Court
11   for the Central District of California (Doc. 1). That District Court remanded the action to
12   California Superior Court, but the Ninth Circuit Court of Appeals reversed that decision.
13   On May 28, 2015, that District Court granted Knight's Motion to Transfer Venue and
14   transferred the action to this Court (Doc. 60). By that time, Plaintiffs were represented by
15   Messrs. Trush, Kahn, and Harrison, as well as Stanley Saltzman, Christina Humphrey, and
16   Lesley Joiner of the law firm Marlin & Saltzman LLP ("Saltzman firm"). (Docs. 65, 66,
17   67, 79, 80, 104 (Motions for Admission *pro hac vice*).)

18         Plaintiffs filed the First Amended Complaint (FAC), the operative pleading, eight
19   years ago, on January 22, 2016. (Doc. 102.) On September 22, 2016, the Court entered an
20   Order (Doc. 148) granting Knight's Motion to Compel Arbitration and Stay Action
21   (Doc. 111). The Court denied Plaintiffs' subsequent Motion to Certify its decision for
22   interlocutory appeal (Doc. 155) and the Ninth Circuit Court of Appeals denied Plaintiffs'
23   Petition for Writ of Mandamus (Doc. 157 at 3). In the parties' first Status Report during
24   the stay, filed on April 17, 2017, Plaintiffs represented that they were "presently
25   considering the current posture of the case" (Doc. 157), and the Court extended the stay of
26   this matter for six more months. (Doc. 158.) In the next Status Report on October 27, 2017,
27   Knight represented that it was willing to confer to discuss arbitrators for Plaintiffs'
28   arbitrations, and Plaintiffs' counsel reported it was "follow[ing] important developments

in the shifting field of the propriety of arbitration clauses in the employment context, which have also made their way to the United States Supreme Court." (Doc. 161.) Considering that the parties had not advanced in the arbitration process in over a year, the Court set a hearing for January 23, 2018, at which it ordered the parties to select arbitrators by April 23, 2018. (Docs. 162–63.) The parties selected one arbitrator by that date (Doc. 165), and the Court continued the stay and to monitor the parties in their selection of arbitrators. (Docs. 167, 169–70.) By October 2018—two years after the Court stayed this matter and ordered arbitration—the parties stated they were awaiting the Supreme Court's decision in a related case, *New Prime v. Oliveira*, and the Court continued the stay of this matter on the parties' request. (Docs. 173–74.) The Supreme Court issued its decision in *New Prime* on January 15, 2019 (Doc. 175), and on August 12, 2019, the parties agreed that, under that decision, this action should proceed in this Court as opposed to arbitration. (Doc. 177.)

On August 26, 2019, the Court ordered Knight to file a responsive pleading to the FAC by September 12, 2019—which Knight timely accomplished—and set a deadline for Plaintiffs to file a Motion for Class Certification of April 13, 2020. (Docs. 178–79.) On the day Plaintiffs' Motion was due, the parties filed a Stipulation requesting an extension to the briefing deadlines because (1) Plaintiffs' counsel Saltzman was diagnosed with Stage 4 prostate cancer in September 2019, the treatment for which had resulted in extreme fatigue; (2) the Governors of California and Arizona had issued "stay at home" orders due to the COVID-19 pandemic; and (3) the parties had agreed to attempt mediation. (Doc. 184.) The Court extended the Motion for Class Certification deadline by seven months, to November 6, 2020, and again upon further requests of the parties to March 12, 2021, and then May 12, 2021. (Docs. 185, 189, 192.) Attorney Paul Cowie appeared on behalf of Knight on March 10, 2021, and attorney Karen Gold, then of the Saltzman Firm, appeared on behalf of Plaintiffs around March 17, 2021.

Plaintiffs finally filed their Motion for Class Certification May 12, 2021 (Doc. 195), which stated that the proposed class consisted of 183 Plaintiffs represented by the existing Plaintiffs' counsel. (Doc. 195.) Knight filed its Response on September 7, 2021 (Doc. 210),

and Plaintiffs filed their Reply on October 4, 2021 (Doc. 221). All the while, the parties requested that the Court resolve multiple discovery disputes, which disputes continue to this day.

On January 11, 2022, the Court entered an Order granting Plaintiffs' Motion for Class Certification (Doc. 230), and the Ninth Circuit denied Knight's petition to appeal that Order (Doc. 232). On October 19, 2022, the Court granted the parties' Stipulation for an Order directing Notice to class members. (Doc. 235.) On the Court's further Order, the parties submitted briefs on the choice of law to be applied in this case on January 23, 2023 (Docs. 248, 251), which briefs are currently pending before the Court. The Court entered an Order (Doc. 347) resetting the current dispositive motion deadline to thirty days after its Order resolving the choice of law issue, which it enters simultaneously with this Order.

That brings the case to the present Motions before the Court. First, Gold, who previously worked at the Saltzman Firm and is now an attorney at Blackstone Law, APC, has filed a Motion purportedly on behalf of Plaintiffs and Class Representatives Lira and Lofton as well as three additional individual Plaintiffs, Alejandro Patino-Garcia ("Patino"), Ernest Carter, and Guillermo Rosete. (Doc. 291.) In that Motion, Gold represents that Saltzman—Plaintiffs' longtime counsel in this matter—passed away in early 2023, and she then left the Saltzman Firm. (Doc. 291 at 2.) She requests (1) that she be named counsel of record for Messrs. Lira, Lofton, Patino Garcia, Carter, and Rosete; (2) that her new firm, Blackstone Law, be named class counsel in this matter; (3) that the Court order the Saltzman Firm to transmit the case file to Blackstone Law; and (4) that the Court continue the remaining case management deadlines.

Plaintiff and Class Representative LaCross, still represented by the Saltzman Firm and the counsel with which it has associated—Trush Law and the Perona Firm—opposes Gold's Motion (Doc. 306), as do the Knight Defendants (Doc. 299). LaCross then filed his own Motion requesting that the Court enjoin Gold and Blackstone Law from interfering with the other Plaintiffs' counsel's prosecution of this matter. (Doc. 293.) In the Motion,

LaCross argues Gold and Blackstone Law engaged in unprofessional conduct and interfered with the relationship between Plaintiffs and their counsel.

**II.   CLASS COUNSEL**

In the Order certifying the class, the Court made two statements regarding Plaintiffs' counsel. The Court acknowledged that "[t]he proposed class includes 183 drivers, all of whom are individually represented by Plaintiffs' counsel." (Doc. 230 at 2.) Additionally, in evaluating adequacy under Federal Rule of Civil Procedure 23(a)(4), the Court noted that class representative plaintiffs and class counsel must not have conflicts with other class members and must prosecute the action vigorously on behalf of the class, and nothing before the Court indicated the class representatives—LaCross, Lira and Lofton—or their counsel were not competent to represent the class. (Doc. 230 at 7 (citing *Evon v. Offs. of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012)).) When discussing class counsel, the Court did not distinguish between Plaintiffs' counsel—the Saltzman Firm, Trush Law and the Perona Firm—because those firms worked in association with each other since the case was transferred to this Court in 2015. Indeed, the parties also drew no distinction between these firms in terms of the level of their representation of Plaintiffs.

The issue of appointing class counsel is now before the Court because a fourth law firm and newcomer to this action, Blackstone Law, wishes to be named class counsel by virtue of obtaining signed Substitution of Attorney forms from five of the 183 class members—two class representatives and three other Plaintiffs. The Court will address the propriety of Blackstone Law's conduct—mainly through the actions of Gold—in obtaining the five Substitution of Attorney forms, in Section III *infra*. But it begins by evaluating which of the four firms representing Plaintiffs is most suited to be appointed class counsel at this point in the litigation.

Rule 23(g)(1)(A) provides that, in appointing class counsel, the Court must consider:

> (i) the work counsel has done in identifying or investigating potential claims in this action;

(ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
(iii) counsel's knowledge of the applicable law; and
(iv) the resources that counsel will commit to representing the class.

Under Rule 23(g)(1)(B), the Court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."

With regard to the first factor, the "work counsel has done" to identify and investigate the potential claims in this action, Trush along with Kahn's Perona Firm have been involved in this lawsuit since its inception in 2014. (Doc. 306-2, Kahn Decl. at 4; Doc. 306-3, Trush Decl. at 3.) The Saltzman Firm with which they then associated has been developing Plaintiffs' claims since 2015, when the case came to this Court. Blackstone Law has only been involved with this case for a few months, and there is no evidence it had anything to do with identifying and investigating claims in this action. Here, Gold asserts accurately that she has been involved in working on the case for several years, albeit while associated with the Saltzman Firm. (*E.g.* Doc. 291 at 3.) But Plaintiffs' claims are embodied in the First Amended Complaint (Doc. 102, "FAC")—the operative pleading— which Saltzman and his associate, Humphrey, filed on behalf of the Saltzman Firm on January 22, 2016, four years before Gold ever did any work on this case. The Saltzman Firm and the counsel with which it has associated in this matter—Trush on behalf of his own law practice and Kahn on behalf of the Perona Firm (collectively, "Associated Counsel")—were entirely responsible for identifying and investigating Plaintiffs' claims in this matter.[1] In sum, the first factor weighs heavily in favor of the Saltzman Firm and Associated Counsel.

The next two Rule 23(g)(1)(A) factors, regarding counsel's relevant experience and legal knowledge, favor neither Blackstone Law on the one hand nor the Saltzman Firm and Associated Counsel on the other. Blackstone Law and Gold show that they have experience

---

[1] The Court notes that while the attorneys who filed the FAC are no longer involved with the matter—Saltzman having passed last year and Humphrey having left the Saltzman Firm shortly thereafter, the firm has identified several attorneys who have assumed responsibility for the matter, albeit more recently. And in any event, Associated Counsel have been involved in and responsible for this matter since its inception.

handling class actions, including some involving wage and hour disputes like this case, and therefore know the applicable law, at least in California. (Doc. 291-1, Gold Decl. at 6–8; Doc. 291-2, Genish Decl. at 1–3.) Likewise, Attorney Cody Kennedy on behalf of the Saltzman Firm shows that he has experience handling class actions, including a case involving more than 100 allegedly misclassified truck drivers similar to this case, and knows the applicable law, particularly in California. (Doc. 306-1, Kennedy Decl. at 2–3.) In addition to his involvement in this case since 2014, Kahn states that he took a complex case involving Fair Employment and Housing, discrimination, retaliation, and harassment claims from inception to a $464 million trial verdict. (Kahn Decl. at 3.) Trush, who has also worked on this case since 2014, albeit as a sole practitioner, stated at the hearing that, since 1992, his "practice has been in class actions to co-counsel with skilled and experienced lawyers that I trust and that I know are excellent advocates." (10/19/23 Hr'g Tr. at 241.) He also has tried cases solo, including a five-week jury trial "in a complicated employment case against a corporate defendant." (10/19/23 Hr'g Tr. at 242.) Considering all the statements regarding counsels' experience and knowledge, the second and third Rule 23(g)(1)(A) factors do not favor Blackstone Law or the Saltzman Firm, even considering the experience and knowledge of its Associated Counsel with respect to this case.

The attorneys' statements regarding the fourth Rule 23(g)(1)(A) factor—the resources counsel will commit to its class representation—were particularly contentious as they apply to the Saltzman Firm. In her brief and at the hearing, Gold, who left the Saltzman Firm months before filing her Motion, stated that the firm has financial difficulties and is planning to wind down its operations. (Doc. 291 at 4.) Kennedy stated that the Saltzman Firm has not decided at this time to wind down or shut down and plans to continue to litigate every case in its profile. (10/19/23 Hr'g Tr. at 239.) In response, Gold stated Kennedy was not being forthcoming because he was not under oath. (10/19/23 Hr'g Tr. at 252–53.) But the Court need not put officers of the Court under oath when they make representations to it, because they are under a duty to be honest in their statements under the rules of professional responsibility. The Court accepts Kennedy's representation that

the Saltzman Firm presently plans to continue to litigate this case using all its resources. (10/19/23 Hr'g Tr. at 239.)

Blackstone Law also said it would commit its firm's resources to representing the class in this case. The fourth Rule 23(g)(1)(A) factor is thus neutral as it pertains to Blackstone Law as compared to the Saltzman Firm alone. But the Court also considers the statements of the Associated Counsel Trush and Kahn that they each would be willing and able to serve as class counsel in this case. (10/19/23 Hr'g Tr. at 240–45.) The three firms have associated since the inception of this lawsuit, and the Court is satisfied that if the Saltzman Firm did wind down its operations—which the Court notes *infra* is a possibility at some point in the future—either Trush or the Perona Firm could seamlessly step in as class counsel. This factor favors the Saltzman Firm and Associated Counsel.

Under Rule 23(g)(1)(B), the Court may consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class," and the Court will address, *infra*, the other matters raised by LaCross's counsel, and in particular, whether Gold and Blackstone Law adhered to the rules of professional responsibility in this matter. For the purposes of the class counsel determination, the Court does not find the Saltzman Firm or Associated Counsel are shown to have engaged in unethical conduct in this matter, and Gold's conduct does not help her or Blackstone Law's case to be named class counsel, as set forth more fully in Section III.C *infra*.

The Court also acknowledges that Knight filed a brief opposing Blackstone Law's request to be named class counsel. (Doc. 299.) In the hearing, Cowie made clear that Knight opined on the Court's appointment of class counsel not because one firm or the other would be more beneficial to Knight's interests—Cowie emphasized the extreme contentiousness between his firm and the Saltzman Firm during the past nine years of this case—but rather because the Saltzman Firm has worked on this case since its inception and in Cowie's view Gold has engaged in unprofessional behavior by misleading two class representatives into believing that Knight and the Saltzman Firm are somehow colluding in this matter. (10/19/23 Hr'g Tr. at 247–48.)

For all these reasons, the Court concludes the Saltzman Firm (supported by Associated Counsel), which is counsel for class representative LaCross and at least 178 of the 183 Plaintiffs in total, shall continue to be class counsel in this matter. Blackstone Law has not demonstrated that it is more qualified than the Saltzman Firm to act as class counsel in this case, and its challenge to the *status quo* thus fails.

## III.   THE RULES OF PROFESSIONAL RESPONSIBILITY AND BLACKSTONE LAW'S REPRESENTATION OF CERTAIN PLAINTIFFS

In his Motion, and based on Gold's and Blackstone Law's alleged conduct, LaCross seeks a Temporary Restraining Order prohibiting Gold and her new firm from:

- "interfering with Class Counsel's prosecution of this matter";

- "communicating with any members of the Certified Class regarding the subject of this litigation"; and

- "directly or indirectly making any false, misleading and/or disparaging statements about Class Counsel to any members of the Certified Class."

(Doc. 293 at iii.) LaCross also seeks an Order:

- rescinding the substitutions of attorney for Lofton, Lira, Garcia, Rosette and Carter;

- "banning [Gold and Blackstone Law] from practicing law in the State of Arizona with respect to this litigation"; and

- imposing sanctions on Gold and Blackstone Law for violations of the Arizona Rules of Professional Responsibility.

(Doc. 293 at iii.)

The gravamen of LaCross's complaint is alleged violations by Gold and Blackstone Law of the applicable Arizona Rules of Professional Conduct[2] and the Local Rules of

---

[2] LaCross's counsel also provides some analysis of the California Rules of Professional Conduct, but the Court will not ground its analysis of duties under those rules for purposes of determining violations here. While the California Rules always will bind California lawyers and may be a basis for disciplinary action before the California Bar

Practice for the District of Arizona. LaCross charges Gold and her firm violated Arizona Rules of Professional Conduct 4.2, 7.3 and 8.4(c). The Court will examine each claim in turn.

## A.    Rule 4.2

ER 4.2 of the Arizona Rules of Professional Conduct provides that

> [i]n representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

ER 4.2 (2003). LaCross asserts that Gold's communications with Patino, and later with Lofton, Lira, Carter, Rosete and him in the late August and early September 2023 timeframe, violated ER 4.2.[3]

Movant and Respondents agree that Gold left the Saltzman Firm on or about June 14, 2023 and was withdrawn from representation of any person in the Knight class action. She did not speak with any class member or representative thereafter until late August when, as Patino testified, he called her to ask about the case, and then the following day called again to ask her to represent him in the matter. After a brief delay, Gold agreed

---

outside the confines of the matter before this Court, Local Rules of Practice and Procedure of the U. S. District Court for the District of Arizona ("Local Rules") make clear that attorneys purporting to practice and represent clients before this Court are held to the Arizona Rules of Professional Conduct. LRCiv 83.2(e). Thus, the Court will evaluate all conduct under the Arizona rules for purposes of determining LaCross's Motion, and will consider California ethics rules and opinions only for their persuasive value.

[3] The Court construes LaCross's charges of professional responsibility violations also to encompass Patino's communications with and solicitations of two other class members—Roger Yanez and Francisco Noriega—each of whom executed declarations in support of LaCross's Motion and testified at the evidentiary hearing on the Motion. Neither Yanez nor Noriega agreed to shift their representation in this matter to Gold and Blackstone Law after speaking with Patino, and Gold did not communicate with either of them about shifting representation. LaCross asserts in his Motion that Patino communicated with and solicited Yanez and Noriega at the direction of Gold. Assuming *arguendo* this is true, the Court's analysis under ERs 4.2, 7.1, 7.3 and 8.4 as to Yanez and Noriega would lead to the same conclusions regarding whether Gold violated any of these rules as it would regarding Gold's direct communications with Lofton, Lira, LaCross, Carter and Rosete. *See, e.g.*, ER 7.3(a) ("'Solicitation' or 'solicit' denotes communication initiated by or on behalf of a lawyer or law firm that is directed to a specific person the lawyer knows or reasonably should know needs legal services in a particular matter and that offers to provide, or reasonably can be understood as offering to provide, legal services for that matter.")

to represent Patino in this matter. Between that time and September 5, 2023, Gold spoke with LaCross, Lofton, Lira, Carter and Rosete, each of whom at least initially agreed to retain Gold and Blackstone to also represent them in the matter. [4]

### 1.  Gold's August 2023 Communications with Patino

As an initial matter, the Court concludes Gold did not violate ER 4.2 in her communications with Patino. In late August 2023, at the time Gold and Patino spoke, Gold did not represent anyone in the matter, having withdrawn as counsel for the class more than two months prior. She therefore did not meet the first qualifier of ER 4.2, which only prohibits communications by a lawyer "in representing a client." While Gold's communications with Patino and others still must be evaluated for propriety under client solicitation and other ethical rules, ER 4.2 does not apply to her contacts with Patino once she had no role as counsel—and therefore no client—in the matter.

### 2.  Gold's Subsequent Communications with Other Class Members

In the week or two after Gold and Blackstone Law accepted representation of Patino in the instant matter, Gold communicated with LaCross, Lira, Lofton, Carter and Rosete—all class members and or representatives. While at that point Gold and Blackstone were representing a class member in the matter, it is not at all clear that Gold's communications with these five individuals were "in representing a client"—their only client then being Patino. For purposes of this analysis the Court assumes at that point the purpose of Gold's communications with each of Lofton, Lira, LaCross, Carter and Rosete was to solicit their changing counsel, or to at least explore the possibility. But the Court still cannot conclude that such discussions were in the service of Patino's interests, and therefore "in representing him." Rather, such solicitation would be overwhelmingly or solely in Gold's and Blackstone's interest, because if successful, they would stand to increase their share of fees were the class to prevail in its action against Knight. The first qualifier of ER 4.2 thus

---

[4] LaCross shortly thereafter rescinded his election to change counsel and remains with the Saltzman Firm and Associated Counsel.

1  still does not appear to apply to Gold's and Blackstone's contact with LaCross, Lira,
2  Lofton, Rosete and Carter.

3         Put another way, the prohibitions of ER 4.2 appear to be an ill fit to the
4  circumstances before the Court, where all counsel in conflict—Gold and Blackstone Law
5  on the one hand and the Saltzman Firm and Associated Counsel on the other—seek to
6  represent persons "on the same side of the 'v.'"—class members and or the plaintiff class
7  itself. Comment 1 to ABA Model Rule 4.2, upon which the Arizona Supreme Court's
8  ER 4.2 is based, provides that the prohibition's purpose is to protect a person who has
9  obtained counsel in a matter against "possible overreaching by other lawyers who are
10  participating in the matter" and "the uncounseled disclosure of information relating to the
11  representation." ABA Model Rules of Professional Conduct, ER 4.2, cmt. 1 (2023).[5] The
12  drafters' focus appears to be on protecting represented persons from attorneys representing
13  adverse interests—in the case of a plaintiff, either a defendant or a co-plaintiff whose
14  interests may not align.

15         The history and application of Arizona's ER 4.2 is consistent with this
16  interpretation. Each of the four comments to Arizona's rule contemplates only contact by
17  lawyers representing a client with an interest adverse to the party they contacted, and of
18  the eleven reported Arizona cases applying the rule, each addresses contact of a represented
19  person by counsel for an adverse party. Indeed, all of the caselaw LaCross cites from
20  foreign jurisdictions on this issue applies to contact by a lawyer for an adverse party, save
21  one case—*Hernandez v. Vitamin Shoppe Indus., Inc.*, 174 Cal. App. 4th 1441 (2009).

22         In *Vitamin Shoppe*, current and former employees brought three putative class
23  actions against Vitamin Shoppe for federal and California state wage and hour violations;

24  ─────────────────

25         [5] Comment 1 also identifies as a purpose of the rule protection against "interference
26  by those lawyers with the lawyer client relationship." *Id.* This general purpose is negated,
   however, when a lawyer's communication with a represented person is "authorized by law"
   as provided in Rule 4.2. And as set forth *infra* in Section III.B of this Order, the Court notes
27  that such authorization appears to exist in ERs 1.4, 1.16, 7.3 and the State Bar of Arizona
   Ethics Opinions interpreting those rules. *See* Ethics Op. 10-02 ("[W]hen a lawyer who is
28  working on a client matter leaves a firm, the lawyer 'has an ethical obligation, under ER
   1.4, to advise his or her clients of the impending departure, so that clients may decide who
   they want to continue the representation'") (citing Ethics Op. 99-14)).

for one of those classes the trial court had granted a preliminary settlement approval and conditionally certified the class for settlement purposes. An attorney representing some plaintiffs in two of those actions contacted class members whom he did not represent, urging them to opt out of the settlement in that action, join another of the three class actions as plaintiffs, and retain him as their lawyer. The California Court of Appeal found that California's version of ER 4.2, which is substantially similar in text to Arizona's version, prohibited a plaintiff's attorney from contacting plaintiff class members represented by other counsel for purposes of solicitation after certification of the class and approval of the notice. 174 Cal. App. 4th at 1458.

As *Vitamin Shoppe* is a California state case interpreting California's professional responsibility rule limiting attorney contact with represented persons, LaCross cites it only for its persuasive value in the Court's interpretation of Arizona's rule. And for that purpose, the Court cannot agree that the holding is persuasive. The Court can find nothing in the limited comments to Arizona's rule, or in the eleven cited federal and Arizona cases interpreting Arizona ER 4.2, to demonstrate it was intended to address the situation now before the Court, where all counsel involved seek to represent plaintiffs whose interests are aligned and the conflict is between the economic interests of counsel only. Put briefly, the facts of this matter do not present an ER 4.2 issue. Rather, as set forth below, the client solicitation rules, and particularly ER 7.3, fit and meet this situation, addressing the relevant concerns.

## B.   Rule 7.3

LaCross next asserts that Gold and Blackstone Law violated ER 7.3 by improperly soliciting him, as well as Patino, Lofton, Lira, Carter and Rosete as clients.

ER 7.3 provides in relevant part:

> (b) A lawyer shall not solicit professional employment by live person-to-person contact when a significant motive for the lawyer's doing so is the lawyer's or firm's pecuniary gain, unless the contact is with a [] person who has a [] prior [] professional relationship with the lawyer or the firm.

(c) A lawyer shall not solicit professional employment or knowingly permit solicitation on the lawyer's behalf even when not otherwise prohibited by paragraph (b) if: (1) the target of the solicitation has made known to the lawyer a desire not to be solicited by the lawyer; or (2) the solicitation involves coercion, duress or harassment.

ER 7.3(b), (c) (2019). LaCross argues that a significant motive for Gold's and Blackstone's solicitations of him and the other class representatives and members was for pecuniary gain and therefore violates ER 7.3(b).

### 1.    ER 7.3(b)

No litigant disputes that for purposes of analyzing professional responsibility issues, the client is the client of the firm, and that when Gold terminated her employment with the Saltzman Firm on June 14, 2023, and her Notice of Withdrawal was filed in this matter shortly thereafter, she ceased to represent any class member or representative. Gold thereafter had no contact with any class member or representative for approximately two months, until Patino called her near the end of August 2023.

As to Patino, the Court finds no ER 7.3 violation has been demonstrated. According to all competent evidence presented—the testimony and declarations of Patino and Gold—Gold did not solicit Patino as her and Blackstone's client; rather, Patino asked Gold if she would represent him. LaCross has offered no evidence to the contrary and the Court has seen none. The Court need go no further in the ER 7.3 analysis regarding Gold's contact with Patino.

The analysis as to LaCross, Yanez and Noriega, however, is different, as all three provided declarations stating that Patino contacted them "on behalf of" Gold. The Court therefore could find, if it credited the above statements, that Gold had solicited employment from LaCross, Yanez and Noriega, and inferring from that pattern and the resulting changes in counsel, that she had solicited Lofton, Lira, Carter and Rosete as well. Although the Court finds reliability issues exist with the testimony of many of the class member witnesses at the hearing, and that those issues abound with nearly all declarations submitted

by either side—a point the Court will return to later in this Order—it concludes that at some point Gold and Blackstone Law did solicit at least the three class representatives and Messrs. Carter and Rosette in the course of Gold's August and or September 2023 communications with them.

The fact of solicitation, however, is not dispositive of an ethical violation. As noted above, ER 7.3 provides an exception for solicitation where the contact is with a person "who has a [] prior []professional relationship with the lawyer[.]" ER 7.3(b). Gold argues that this exception applies because as an associate for the Saltzman Firm until June 2023 and for the two to three years prior, she represented each of the class members and representatives at issue and had personal contact with Patino, Lira, Lofton, LaCross, Yanez, Noriega, Carter and Rosete in the form of representing them at proceedings and communicating with them on behalf of the firm to update them on the status of the matter. Gold asserts she thus had a "professional relationship" with them.

LaCross counters that Gold's work on the case while with the Saltzman firm, although consistent, was not substantial enough to create the professional relationship necessary to trigger the exception of Rule 7.3(b). The Court disagrees as to the class representatives and Patino, Yanez and Noriega. From 2021 to mid-2023, the evidence reflects that Gold had as much contact with those six clients as any attorney at the Saltzman Firm, and likely more than any attorney still at that firm. The contact was substantive as well: it included representing at least Patino, Yanez, Lofton and Lira at their depositions and providing updates on the matter to all six, both in writing and in telephone calls. The Court concludes that Gold's prior professional relationship with Patino, Yanez, Noriega, Lira, Lofton and LaCross was substantial enough to trigger the "professional relationship" exception of ER 7.3(b) and allow her to solicit legal employment from those six individuals, absent any other rule violation. See Ethics Op. 10-02 ("Whether the client needs to be informed of the lawyer's departure and reminded of the client's right to choose counsel depends on whether, viewed from the perspective of the client, the client's decision

1   about who should continue the representation might depend on the continued involvement

2   of the departing lawyer.")

3        There is less direct evidence to conclude such a substantial professional relationship

4   existed between Gold and either Rosete or Carter. No evidence was presented at the hearing

5   or in support of the briefs as to the relationship between Gold and these two class members,

6   beyond Gold's general averment that she would have sent them letters on behalf of class

7   counsel. Nonetheless, the Court finds sufficient circumstantial evidence to conclude that

8   they are similarly situated to Noriega at least, in that Gold, as the Saltzman Firm's "minder"

9   attorney for the class action between 2021 and June 2023, had telephonic and mail

10   communication with many or all class members to update them about the matter's status.

### 2.      ER 7.3(c)

12        Of the clients Gold solicited or potentially solicited, one—LaCross—has alleged

13   coercion, harassment, or that that Gold continued to attempt communication with him after

14   he made known his desire not to be solicited, any of which actions are prohibited under

15   ER 3.7(c). In his declaration, LaCross asserted that:

> - on September 5, 2023, once he decided to revoke his retention of Gold and Blackstone Law to represent him, he authorized Kahn to tell Gold and Blackstone Law not to communicate with him further, but despite knowledge of this directive, Gold called him again;
>
> - during that call, after LaCross told Gold he did not want to talk to her any more, she continued to "pressure" him to allow her and Blackstone Law to represent him; LaCross did not relent and Gold ended the call;
>
> - shortly after that call ended, Jonathan Genish of Blackstone Law called LaCross and tried to "pressure" and "badger" LaCross to stay with Blackstone.

27   (Hr'g Ex. 117 ("LaCross Decl.") ¶¶ 27-30.) If credited, the statements form a basis for a

28   finding that Gold and Blackstone Law at least continued to solicit LaCross after he made

clear he did not wish to be solicited. In light of LaCross's testimony at the hearing, however, the Court is left with significant doubt about the accuracy of these statements in his declaration because on cross-examination at the hearing, he abandoned several other statements he had made in that declaration. For example, La Cross also stated in his declaration that Patino "was calling me on behalf of Karen I. Gold." (LaCross Decl. ¶ 5.) Yet when asked if that statement in his declaration was true, LaCross testified, "No. He didn't use the term, 'on behalf of Karen Gold.'" (10/17/23 Hr'g Tr. at 32.)

The issue of whether Patino was contacting LaCross and other class members on behalf of Gold was central to the ER 4.2 and 7.3 analysis—a subject that is peculiarly the focus of lawyers rather than lay fact witnesses—and the term's uniform inclusion in the declarations of LaCross, Yanez and Noriega reflects the heavy involvement of attorney drafters in the declaration, as do other statements in the declaration.[6] That and the readiness with which LaCross abandoned his prior statement in the declaration despite his near-immediately previous testimony at the hearing that everything in his declaration was true (10/17/23 Hr'g Tr. at 30) leaves the Court with doubts about the accuracy of the above statements and their susceptibility to shaping and steering by drafting counsel. The Court's doubts are significant enough that absent corroboration, it cannot find harassment or improper communication by Gold after LaCross revoked his decision to retain her new firm.[7]

---

[6] For example, the LaCross Declaration also states that "Ms. Gold never told me she had any financial interest in bring[ing] the case to her new firm." (LaCross Decl. ¶ 10.)

[7] The Court does not single out LaCross's declarations and testimony among all class member declarant-witnesses. To some degree all counsel on both sides of this dispute have treated class members who submitted declarations and or testified at hearing like ping pong balls, calling into question the extent of the credibility of their statements and requiring the Court to make factual determinations thereon for the limited purpose of deciding these motions. The Court could as easily highlight portions or Patino's and Lira's declarations that failed to withstand cross-examination at the hearing. And one counsel called into question the accuracy of the testimony of Messrs. Yanez and Noriega due to their facility with the English language, while another counsel cast doubt on LaCross's cognitive abilities now compared to several years ago. Various counsel may have perceived short-term advantage in 1) having the witnesses adopt these declarations, 2) discrediting witnesses in cross-examining them on their declarations, and or 3) questioning the witnesses' communication abilities or the clarity of their thinking and memory, in order to prevail on the short-term issue of who would represent class members and representatives.

1

### 3.    ERs 1.4, 1.16

Gold and Blackstone have advanced a related argument that Gold's contact with and solicitation of all class members with whom she had contact is permissible under an extended analysis of ER 1.4(a)(3) and ER 1.16(d). Those rules speak, respectively, to an attorney's duties to communicate with her clients to keep them reasonably informed about the matter and to take steps to protect their interests upon withdrawal.

In furtherance of this argument, Gold and Blackstone cite Arizona and foreign jurisdiction ethics opinions providing that upon the departure of an attorney from a firm serving a client, where that attorney has performed substantial work for the client, the departing attorney and the firm should apprise the client of the lawyer's departure and inform the client of the option to remain with the firm or go with the departing attorney,[8] explaining this option in a fair and neutral manner.[9] The Court is persuaded by these opinions that such a communication by a departing attorney and a firm to a client is appropriate and even required under Arizona's rules and therefore "provided by law" for purposes of the other ethical rules in qualifying circumstances. *See* FN 5 *supra*. But

---

But with respect to the longer view, the Court has concerns about the damage such decisions taken by various counsel for plaintiff class members may have done to their clients' interest in the ultimate outcome of the matter, in that defense counsel may now be armed with impeachment as to witness credibility should testimony at trial ever be necessary.

[8] See Ethics Op. 99-14 (providing that "a lawyer has an obligation to advise the client of his or her impending departure 'to permit the client to make informed decisions regarding the representation'"; Ethics Op. 10-02 ("[W]hen a lawyer leaves the employment of a law firm [,] both the lawyer and the firm he or she is leaving have ethical obligations to the firm's clients and must work together as necessary to ensure that the lawyer's departure does not prejudice any of the clients for whom the lawyer was working. . . . the client, not the lawyer or law firm, chooses which lawyer will continue to represent the client.")

[9] See Ethics Op. 99-14 ("[C]ommunications by the departing lawyer with the prospective clients must not be misleading or overreaching"); ABA Formal Opn. No. 99-414 (notice to client of lawyer departure should be provided in a manner that enables the client to make a "reasonable, informed decision about who should carry on with the representation," and joint notice is preferable to unilateral notice by either the lawyer or the law firm alone because it is "a better way in which to protect clients' interests."); *see also* State Bar of Cal. Formal Opn. No. 2020-201 at 8 ("Each lawyer should also refrain from making any false or misleading comments about the other when communicating to the client.")

- 18 -

1    because the Court has concluded Gold did not clearly violate ER 7.3, it need not reach this

2    related alternate argument.[10]

3        **C.    False Statements**

4        ER 8.4(c) provides in relevant part that it is "professional misconduct for a lawyer

5    to . . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation."[11]

6    LaCross asserts that in her communications with class members, Gold made several

7    misrepresentations and dishonest statements about the Saltzman Firm and the status of the

8    case, among them:

9

10       -   that the Saltzman Firm was "going to dissolve due to Stan
             Saltzman's death and that no one else was at the Saltzman firm
11           any more" and "there were no attorneys left on the Knight class
             action to handle the case and make sure it kept going forward"
12           (LaCross Decl. at 8);

13

14       -   that Gold was "the only attorney who had been working on the
             Knight class action who knew what was going on and who was
15           capable of continuing with the case" (LaCross Decl. at 8);

16

17       ───────────────────

18       [10] The Court notes, however, that both sets of attorneys' arguments for the
     application of the ethics opinions are problematic. The Saltzman Firm acknowledges that
19   it never informed the class members about Gold's departure or gave them the choice to
     stay or go with Gold. It takes the position that such an advisory was unnecessary in this
20   matter because Gold's work on the matter while she was at the Saltzman Firm was not
     substantial enough to justify notice to the clients. But the Court has already rejected that
21   position in its analysis in Section III.B.1 *supra*. On the other hand, once Gold
     communicated with class members about representing them, her communications were
22   hardly neutral advisements prescribed by Ethics. Ops. 99-14 and 10-02, as the Court
     discusses *infra* in Section III.C, and that slanted communication could risk impairing the
23   ability of the client to make accurately informed decisions in their best interest. On this
     analytical point the Court would find significant shortcomings in all the attorneys' efforts
24   to safeguard the interests of the class members.

25       [11] In his Motion, LaCross also cites ER 7.1's prohibition against a lawyer making a
     false or misleading communication about the lawyer or the lawyer's services. This rule
26   would not apply to those statements LaCross complains of that pertain solely to original
     class counsel, as such statements do not implicate representations about the lawyer seeking
27   to market her services—here Gold and her new firm, Blackstone Law. The Rule would,
     however, pertain to the statements complained of that refer to Gold's own abilities or
28   actions as counsel, and the Court will so analyze them. In any event, the analysis of false
     or misleading statements or communications under ER 7.1 or ER 8.4(c) is materially the
     same.

1

2

-   that "certified class counsel can't be trusted" (Doc. 294-2 ("Noriega Decl.") ¶ 7); and

3

4

-   that class members who signed up with Gold would recover at least $1,000 per workweek (Doc. 293 at 14).

5

6

7

8

9

The Court questioned counsel Kennedy and Gold closely on each of these representations and the basis (or absence) therefore at the continuation of the hearing. It considers counsel's responses and citations to the record, in addition to the declarations and the fact witness testimony adduced at the first day of hearing in making its determinations.

10

11

12

13

14

15

16

17

As to Gold's representations to several class members that the Saltzman Firm was "going to dissolve" and there would be "no one left to handle the case," the Court finds the statements were misleading at least in part and constituted an overstatement. To be clear, Gold's statement that the Saltzman Firm was "going to dissolve" had some basis. Gold set forth in her declaration and at the hearing that upon Saltzman's death, the firm's subsequent management was paring staff and advised all employees that the firm was in significant debt, the response to which was layoffs. Gold also stated management had told the layoff victims "they didn't have the money to keep the firm afloat." (10/19/23 Hr'g Tr. at 11.)

18

19

20

The Court then asked Kennedy several questions about why Gold's statements were untrue, ultimately inquiring, "is it the intention of Marlin & Saltzman to continue to be a going concern or is there a wind-down contemplated?" Kennedy responded in part,

21

22

23

24

25

At this time, we are continuing to, well, one, we continue to litigate every case in our profile, and two, there has been no decision made for any shut-down date or any wind down. You know, I'm not going to limit Marlin & Saltzman's options in the future because it depends on how these next few years work out, how, you know, the firm continues to grow and move forward."

26

27

28

(10/19/23 Hr'g Tr. at 44-45.) The Court appreciates counsel's care not to mislead it in his response and credits him for it. But the response can only be read to imply that a wind-down of the Saltzman Firm has been contemplated and is not off the table, and at a

- 20 -

minimum lends credibility to Gold's account of what management told her and the conclusions she drew from that information. While Gold's statement that the firm was "going to dissolve" may have constituted some overreach in its concreteness and suggestion of imminence, it was not without basis.

On the other hand, Gold's companion statement that "there were no attorneys left" on the Knight class action to handle it was insupportable. Even if Gold's prediction that the Saltzman Firm would close proved true, she knew that Trush's and Kahn's firms continued to work on and provide continuity in the matter. This statement was misleading.

Gold's statement to LaCross and others that she was "the only one who had been working on the Knight case who knew what was going on and who was capable of continuing with the case" is at least partly problematic for the same reason. The evidence before the Court suggests that Gold and her colleague, Melissa Mayhood, were performing most or all day-to-day handling of the Knight class action matter until their respective departures from the Saltzman Firm in summer 2023. But simply because Gold and Mayhood were the only attorneys handling the matter day-to-day does not mean that once Mayhood stepped away, Gold was the only one who knew what was going on with it. The record indicates that upon Saltzman's passing, Kennedy and Lazar both undertook a supervisory role and Gold reported to them periodically on the matter. More importantly for purposes of evaluating Gold's state of knowledge on this issue, Trush and Kahn both continued to be "read in" on the matter, as they had been for years. Gold's statements about Trush, at least, support that she felt he was competent and diligent in his representation of the class. That necessarily would include "knowing what is going in" with the matter. Gold's statement that she was the only one who knew what was going in with the case was therefore misleading and untrue.

The Court does not conclude the remainder of Gold's statement—that she was the only one "who was capable of continuing with the case"—was factually misleading. That statement, like her statement that "certified class counsel can't be trusted"—is opinion, and would clearly be recognized as such by any prospective client. As such, while the

statements cause the Court to question the judgment of counsel uttering them in the client context, they are not false or misleading for purposes of ERs 7.1 or 8.4(c).

Finally, the Court cannot attribute to Gold Patino's statements to other class members that those who signed up with Gold and Blackstone "would recover at least $1,000 per workweek." Patino testified that Gold never told him that, and the source for his numbers was his independent research into another similar case. Importantly, upon cross-examination, Noriega acknowledged that he never heard such a representation from Gold and his understanding came only from Patino. (10/17/23 Hr'g Tr. at 49-51.) In his argument, LaCross casts doubt upon the credibility of Patino's assertion that Gold never made such a promise. But there is no evidence detracting from Patino's testimony on this point and the Court finds it plausible at least. The Court cannot conclude on such a record that Gold made a false or misleading statement guaranteeing or promising a result in the matter.

The Court concludes that Gold did mislead some class members in her statements that after she left the Saltzman firm there was no one left who knew what was going on with the matter and who could and would carry it forward. It also harbors concerns about the judgment Gold and Blackstone Law exercised in making some of the other statements discussed above, whose utility to the class members is very questionable. Ultimately, however, the Court will not disqualify Gold or Blackstone from representation of individual Plaintiffs, whose right to choose their counsel in light of all information is to be honored.

## IV.   CERTAIN PLAINTIFFS' SUBSTITUTION OF ATTORNEY NOTICES

Plaintiffs and current class representatives Lira and Lofton, as well as Plaintiffs Patino, Carter, and Rosete, have signed Substitution of Attorney forms to name Blackstone Law as their counsel in this matter. Now that the Court will deny Blackstone Law's request to be named class counsel, a conflict has arisen with regard to Messrs. Lira and Lofton's roles as class representatives. Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class," which includes the requirement that the

class representatives and their counsel have no conflicts of interest with other class members. *Evon*, 688 F.3d at 1031. An inherent conflict exists between Lira and Lofton on one hand, and LaCross on the other, because they are presently represented by different counsel. Before the Court requires the withdrawal of Lira and Lofton as class representatives, the Court will give them the opportunity to elect to be represented by class counsel in this matter—the Saltzman Firm. If they decline, the Court will require their withdrawal as class representatives in this matter.

Blackstone Law also requests that the Court order the Saltzman Firm to transmit a copy of the entire case file to Blackstone Law. Because the Court will deny Blackstone Law's request to be class counsel, a transfer of the case file is only appropriate as it pertains to the Plaintiffs that Blackstone Law will now represent. Once Lira and Lofton make their election of counsel, the Saltzman Firm shall transmit the case files to Blackstone Law only pertaining to the Plaintiffs the latter firm will represent.

For the same reason, the Court will deny Blackstone Law's request to continue the case deadlines in this matter.

**IT IS THEREFORE ORDERED** granting in part and denying in part Blackstone Law's Motion and Application for an Order Substituting Blackstone Law as Counsel of Record for Representative Plaintiffs Robert Lira and Matthew Lofton, Appointing Blackstone Law as Class Counsel, Compelling Marlin & Saltzman to Transmit a Copy of its Entire Case File to Blackstone Law, and Granting a Continuance of all Deadlines (Doc. 291). Blackstone Law may represent any or all of the five Plaintiffs who have filed Substitution of Attorney forms and who elect to remain with Blackstone Law, but its Motion is otherwise denied.

**IT IS FURTHER ORDERED** denying Plaintiff Patrick LaCross's *Ex Parte* Motion for Issuance of a Temporary Restraining Order and Setting an Order to Show Cause Why Respondents Should not be Constrained from Interfering with the Prosecution of this Matter (Doc. 293).

1   **IT IS FURTHER ORDERED** that Marlin & Saltzman, LLP shall remain class

2   counsel in this matter.

3   **IT IS FURTHER ORDERED** that, by **February 9, 2024**, Plaintiffs and class

4   representatives Robert Lira and Matthew Lofton shall notify the Court whether they elect

5   Blackstone Law, APC or Marlin & Saltzman, LLP as their counsel in this matter. If they

6   elect not to proceed represented by Marlin & Saltzman, the resulting conflict under Rule

7   23(a)(4) will require that they be withdrawn as class representatives in this matter.

8   **IT IS FURTHER ORDERED** that, upon the filing of Lira's and Lofton's election

9   of counsel, and at the latest by **February 23, 2024**, Marlin & Saltzman shall transmit the

10  case files to Blackstone Law only pertaining to the Plaintiffs the latter firm will represent.

11  **IT IS FURTHER ORDERED** that the previously set case deadlines remain in

12  effect pending entry of the Court's forthcoming Order addressing the choice of law issues.

13  (Doc. 347.)

14  Dated this 23rd day of January, 2024.

15

16  Honorable John J. Tuchi
    United States District Judge